UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFEREY ALLAN JOAQUIN,<br><br>   Plaintiff,<br><br> v.<br><br>DANIEL BUDA, et al.,<br><br>   Defendants. | Case No. 22-cv-04766-JST<br><br>**ORDER OF DISMISSAL**<br>Re: ECF No. 19 |

  Plaintiff, an inmate at Mendocino County Jail, has filed a *pro se* action pursuant to 42 U.S.C. § 1983 against correctional officials at San Quentin State Prison ("SQSP"), where he was previously housed. Plaintiff's second amended complaint is before the Court for screening pursuant to 28 U.S.C. § 1915A.

## DISCUSSION

**A. Standard of Review**

  A federal court must conduct a preliminary screening in any case in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity. *See* 28 U.S.C. § 1915A(a). In its review, the court must identify any cognizable claims and dismiss any claims that are frivolous, malicious, fail to state a claim upon which relief may be granted or seek monetary relief from a defendant who is immune from such relief. *See* 28 U.S.C. § 1915A(b)(1), (2). *Pro se* pleadings must, however, be liberally construed. *See United States v. Qazi*, 975 F.3d 989, 993 (9th Cir. 2020).

  Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Specific facts are not necessary; the statement need only '"give the defendant fair notice of what the . . . claim is and the

grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citations omitted). While Rule 8 does not require detailed factual allegations, it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). A pleading that offers only labels and conclusions, or a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement does not suffice. *Id.*

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

**B.    Procedural Background**

The amended complaint alleged that the medical treatment provided by Pelican Bay State Prison ("PBSP") doctors Daniel Buda, Laurie Thomas, Elena Tootell, and Donna Jacobsen; Associate Warden D. Blythe; Warden Jim Robertson; outside oral maxillofacial surgeon William Martey; and Dr. Martey's female assistant for Plaintiff's salivary gland infection constituted deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth Amendment. ECF No. 10 ("FAC").  The Court dismissed the amended complaint with leave to amend because the amended complaint did not allege facts from which it could be reasonably inferred that defendants Buda, Thomas, Jacobsen, Blythe, Robertson, and Tootell acted unreasonably in referring Plaintiff to defendant Martey for surgery and because the amended complaint indicated that prison officials provided Plaintiff with prompt and regular treatment for his infection.  The Court found that, at most, the amended complaint stated a state-law claim for negligence.  ECF No. 17.

**C.    Second Amended Complaint**

The second amended complaint, ECF No. 19 ("SAC"), names as defendants Pelican Bay State Prison doctors Daniel Buda, Laurie Thomas, Elena Tootell, and Donna Jacobsen.  Plaintiff again alleges that the medical treatment for Plaintiff's salivary gland infection violated the Eighth Amendment, specifically the referral to an oral maxillofacial surgeon instead of an ENT; defendant Buda's delay in prescribing antibiotics and prescription pain medication; and defendant

1    Tootell's failure to intubate Plaintiff when he had trouble breathing due to swelling from the
2    infection.
3        According to the second amended complaint and the medical records attached to Plaintiff's
4    initial complaint, Plaintiff received the following treatment, or lack thereof, for his infected
5    salivary gland.
6        Plaintiff first reported an issue with his salivary gland on September 8, 2019, stating that
7    his salivary gland was blocked and that the pain was at level 9. He requested medical treatment.
8    On September 9, 2019, Plaintiff was seen by RN Rochuba in response to this request. RN
9    Rochuba emailed defendant Buda, stating that she had no SNP for infection pain and asked if
10   defendant Buda could provide a prescription for something for a few days. Defendant Buda
11   responded that Plaintiff's reported condition usually improved with warm compresses and that
12   Plaintiff could obtain ibuprofen from the canteen if he had pain. SAC at 5, 13, 19.
13       On September 25, 2019, Dr. Martinez examined Plaintiff and ordered an antibiotic,
14   amoxicillin, to treat the infection. SAC at 5, 17.
15       On October 25, 2019, in response to Plaintiff's report that his salivary gland was still
16   infected, defendant Thomas prescribed the antibiotic cephalexin for Plaintiff, as well as 650 mg of
17   acetaminophen. ECF No. 1-1 at 22.
18       On November 14, 2019, in response to Plaintiff's report that there was an increase in pus
19   discharge from his salivary gland, defendant Buda prescribed a 10-day course of the antibiotic
20   clindamycin for Plaintiff and ordered a culture of the infected area. ECF No. 1-1 at 27.
21       On November 24, 2019, Plaintiff again sought treatment for his salivary gland, stating that
22   pus was still coming out of the gland, that the pain was at a level 9, and that there was a lump on
23   the left side of his throat under the jawline that was tender to the touch. On November 25, 2019,
24   RN Nasr saw Plaintiff in response to this request. RN Nasr sent Plaintiff to the Critical Treatment
25   Center where he was seen by defendant Thomas. Defendant Thomas did a physical examination
26   of the affected area. In the progress notes, defendant Thomas noted that the infection had not
27   responded to three different antibiotics (Augmentin, Cephalexin, and Clindamycin); that a
28   November 18, 2019 culture had tested positive for Eikenella corrodens; and that Plaintiff had been

3

1    referred to an ear-nose-and-throat doctor on November 2, 2019, but that there had been no word

2    on the referral.  Defendant Thomas put in a high-priority order for Plaintiff to be evaluated by an

3    oral maxillofacial surgeon and wrote in the medical notes that Plaintiff would need the stone

4    surgically excised.  Defendant Thomas advised Plaintiff to continue with arm compresses and

5    gentle massage, and to rinse out his mouth with a chlorhexidine rinse.  SAC at 6, 19, 21-23.

6           This order to be evaluated by an oral maxillofacial surgeon was promptly approved by

7    defendants Jacobsen and Tootell and scheduled for December 16, 2019.  ECF No. 1-1 at 39-40.

8           Around ten days prior to his operation, Plaintiff submitted a medical slip informing

9    medical staff that his throat was beginning to swell due to the infection.  Defendant Tootell was

10   afraid for Plaintiff when she heard this, and discussed with medical staff in the Critical Treatment

11   Center whether they should intubate Plaintiff to ensure that he would be able to continue to

12   breathe.  Defendant Tootell and medical staff decided against intubation because it would cause

13   Plaintiff discomfort and left him in his cell.  ECF No. 19 at 7.

14          On December 16, 2019, oral maxillofacial surgeon Dr. Martey performed the oral surgery,

15   which caused Plaintiff detrimental harm.  ECF No. 19 at 6.

16          Defendant Buda followed up with Plaintiff on January 7, 2020.  In the progress notes,

17   defendant Buda noted that Plaintiff reported no pain relief following the surgery and continued to

18   have pain, swelling, and drainage.  ECF No. 1-1 at 46.  On January 21, 2020, Plaintiff had a

19   follow-up appointment with Dr. Martey.  Dr. Martey concluded that Plaintiff would need an ENT

20   evaluation.  ECF No. 1-1 at 59.  On February 2, 2020, defendant Buda saw Plaintiff for a follow-

21   up evaluation of the left salivary gland and ordered a soft tissue neck CT scan with contrast.  ECF

22   No. 1-1 at 58.  The CT scan indicated that Plaintiff had a significantly dilated left submandibular

23   duct with ranula and multiple sialoliths.  ECF No. 1-2 at 54.

24          Plaintiff was scheduled to be seen by an ENT via telemedicine on March 2, 2020.  ECF

25   No. 1-1 at 57.  The ENT concluded that there was some scarring of the left salivary gland after the

26   irrigation and drainage performed by Dr. Martey and opined that Plaintiff might need to remove

27   the gland.  The ENT requested a face-to-face followup with Plaintiff for a more thorough exam.

28   ECF No. 1-2 at 39.  On March 4, 2020, defendant Buda put in a request for Plaintiff to be seen in

person by an ENT doctor. Defendant Tootell approved the request that same day. ECF No. 1-2 at 35. The follow-up appointment was scheduled with Dr. Ow for April 15, 2022. ECF No. 1-2 at 39; ECF No. 1-2 at 23. In the meantime, defendant Buda prescribed Plaintiff with tramadol to address the pain. ECF No. 1-2 at 39. On March 11, 2020, Plaintiff was seen by defendant Tootell, who memorialized in the progress notes that, based on the recent ENT recommendation, the salivary gland should not be irrigated and drained and the plan was to wait on definitive surgical removal. ECF No. 1-1 at 57; ECF No. 1-2 at 36.

On April 2, 2020, Dr. Ow cancelled the appointment because of COVID. ECF No. 1-2 at 23. Plaintiff was seen by Dr. Ow on April 27, 2020, and again on May 22, 2020. ECF No. 1-2 at 32, 37. Dr. Ow diagnosed Plaintiff as having a complete blockage of the left salivary drainage system with a large mucocele/ranula. Dr. Ow presented Plaintiff with two treatment options: (1) a referral to Dr. Squires to consider endoscopic removal of the stones; or (2) Dr. Ow could prefer a two-hour outpatient surgery to excise the gland. ECF No. 1-2 at 36, 54. Because it could take several months to obtain a contract for Plaintiff to be seen by Dr. Squires, Plaintiff elected to proceed with the surgery by Dr. Ow. ECF No. 1-2 at 43-44.

The patient education materials (discharge papers) provided to Plaintiff after both his September 9 and November 25 appointments stated as follows:

> **DIAGNOSIS**
> . . . . You may need to see an ear, nose, and throat specialist (*ENT* or *otolaryngologist*) for diagnosis and treatment. You may also need to have diagnostic tests, such as:
> - An X-ray to check for a stone.
> - Other imaging studies to look for an abscess and to rule out other causes of swelling. These tests may include:
>   - Ultrasound.
>   - CT scan.
>   - MRI.
> - Culture and sensitivity test. This involves collecting a sample of pus for testing in the lab to see what bacteria grow and what antibiotics they are sensitive to. The testing sample may be:
>   - Swabbed from a salivary gland duct.
>   - Withdrawn from a swollen gland with a needle (*aspiration*).
>
> **TREATMENT**
> Viral salivary gland infections usually clear up without treatment. Bacterial infections are usually treated with antibiotic medicine. Severe infections that cause difficulty with swallowing may be treated with an IV antibiotic in the hospital.
> Other treatments may include:
> - Probing and widening the salivary duct to allow a stone to pass. In some cases, a thin,

> flexible scope (*endoscope*) may be inserted into the duct to find a stove and remove it.
> - Breaking up a stone using sound waves.
> - Draining an infected gland (*abscess*) with a needle.
> - In some cases, you may need surgery so your health care provider can:
>   - Remove a stone.
>   - Drain pus from an abscess.
>   - Remove a badly infected gland.
>
> **HOME CARE INSTRUCTIONS**
> - Take medicines only as directed by your health care provider.
> - If you were prescribed an antibiotic medicine, finish it all even if you start to feel better.
> - Follow these instructions every few hours:
>   - Suck on a lemon candy to stimulate the flow of saliva.
>   - Put a warm compress over the gland.
>   - Gently massage the gland.
> - Drink enough fluid to keep your urine clear or pale yellow.
> - Rinse your mouth with a mature of warm water and salt every few hours.  To make this mixture, add a pinch of salt to 1 cup of warm water.
> - Practice good oral hygiene by brushing and flossing your teeth after meals and before you go to bed.
> - Do not use any tobacco products, including cigarettes, chewing tobacco, or electronic cigarettes.

ECF No. 1-2 at 47.

**D.    Dismissal with Prejudice**

Plaintiff alleges that Defendants violated the Eighth Amendment in the following ways. Defendant Buda did not provide him with antibiotics or pain medication within a reasonable time after learning of the infected gland and Plaintiff's constant and severe pain.  Plaintiff ultimately did not receive antibiotics until two and a half weeks after he first reported the infection; and did not receive adequate pain medication until approximately eight months later, in or around April 2020.  Defendants were aware that Plaintiff should only be seen by an ENT doctor and failed to intervene when Plaintiff was referred to an oral maxillofacial surgeon for operation.  Defendant Tootell failed to intubate Plaintiff after being informed that Plaintiff was having trouble breathing due to swelling from the infection.  ECF No. 19 at 8-9.

The second amended complaint again fails to state a violation of the Eighth Amendment. The second amended complaint's allegations do not give rise to a reasonable inference that Defendants acted, or failed to act, in conscious disregard of an excessive risk to Plaintiff's health.

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  *See Estelle v. Gamble*, 429 U.S.

1  97, 104 (1976).  A prison official is deliberately indifferent if he knows that a prisoner faces a
2  substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate
3  it.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  In order for deliberate indifference to be
4  established, therefore, there must be a purposeful act or failure to act on the part of the defendant
5  and resulting harm.  *See McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in
6  part on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).
7  "A difference of opinion between a prisoner-patient and prison medical authorities regarding
8  treatment does not give rise to a § 1983 claim."  *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th
9  Cir. 1981).  Similarly, a showing of nothing more than a difference of medical opinion as to the
10  need to pursue one course of treatment over another is insufficient, as a matter of law, to establish
11  deliberate indifference.  *See Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004).  In order to
12  prevail on a claim involving choices between alternative courses of treatment, a plaintiff must
13  show that the course of treatment the doctors chose was medically unacceptable under the
14  circumstances and that he or she chose this course in conscious disregard of an excessive risk to
15  plaintiff's health.  *Toguchi*, 391 F.3d at 1058.  A claim of medical malpractice or negligence is
16  insufficient to make out a violation of the Eighth Amendment.  *See Toguchi*, 391 F.3d at 1060;
17  *see, e.g., McGuckin*, 974 F.2d at 1059 (mere negligence in diagnosing or treating medical
18  condition, without more, does not violate prisoner's Eighth Amendment rights).

19  At most, Plaintiff has stated a difference of opinion between himself and his physicians as
20  to the appropriate course of treatment.  Although Plaintiff may believe that defendant Buda
21  delayed unreasonably in providing him with antibiotics and prescription-strength pain medication;
22  that defendant Tootell should have intubated him upon learning that his throat was swelling from
23  the infection; and that Defendants should not have allowed him to be referred to an oral
24  maxillofacial surgeon, Plaintiff's medical records and the patient education materials contradict
25  his belief that the treatment provided by Defendants was medically unacceptable.

26  Contrary to Plaintiff's allegations, the patient education materials (discharge
27  documentation) do not establish that the only proper course of treatment was referral to an ENT
28  and prompt prescription of antibiotics and prescription-strength pain medication.  Rather, the

7

patient education materials recommend the medical treatment provided by Defendants. The patient education materials state that the patient *may* need to consult an ENT for diagnosis and treatment and also state that treatment may include draining an infected gland or probing and widening the salivary gland to allow a stone to pass. The patient education materials do not state, or imply, that the only specialist appropriate for treating a salivary gland infection is an ENT. Nor do the patient education materials state, or imply, that referral to any other kind of specialist is medically unacceptable and would knowingly put a patient at substantial risk of serious harm. In addition, the record indicates that a referral for an ENT was made on November 2, 2019, two months after Plaintiff first reported issues with his salivary gland and soon after the second course of antibiotics had proven ineffective; and that the referral to the oral surgeon was ordered on November 25, 2019 because Plaintiff's condition had worsened significantly and the ENT referral had not been acted upon. Given this context and the treatment options listed in the patient education materials, the choice to refer Plaintiff to an oral surgeon while waiting for the ENT referral was not medically unacceptable and did not consciously disregard an excessive risk to Plaintiff's health.

Defendant Buda's decision to initially prescribe warm compresses and ibuprofen before prescribing antibiotics and prescription strength medication is also consistent with the patient education materials. The materials explain that viral salivary gland infections usually clear up without treatment, but bacterial infections require antibiotics, and that the recommended home treatments are warm compresses, gentle massage, stimulating the flow of saliva, and rinsing with a mixture of warm water and salt. There is nothing in the record indicating that defendant Buda knew that Plaintiff's salivary gland infection was bacterial, not viral, when he first learned of it, and Plaintiff was prescribed antibiotics within two weeks of reporting the salivary gland infection. Given Plaintiff's medical records and the treatment options listed in the patient education materials, the choice to initially prescribe warm compresses and ibuprofen was not medically unacceptable and did not consciously disregard an excessive risk to Plaintiff's health.

Defendant Tootell's failure to intubate Plaintiff upon learning that he had trouble breathing also was not medically unacceptable and did not consciously disregard an excessive risk to

Plaintiff's health.  Plaintiff argues that the failure to intubate violated the Eighth Amendment because when a patient reports trouble breathing, choosing not to intubate because of the patient's discomfort is medically unacceptable.  However, Plaintiff has drawn an unsupported conclusion from defendant Tootell's statements.  Plaintiff reports that defendant Tootell told him that she and the medical staff were so concerned when he reported having difficulty breathing that she and the medical staff considered admitting him to the infirmary and intubating him, but decided against him because they worried that intubation would cause him discomfort.  Defendant Tootell did not state or imply that intubation was the only reasonable or acceptable medical treatment for trouble breathing due to swelling from an infection.  Trouble breathing due to throat swelling from an infection can be treated in numerous ways, including but not limited to intubation.

Finally, the SAC and the medical records filed with the Court indicate that prison officials, including Defendants, provided Plaintiff with prompt and regular treatment for his infection.  After being informed of Plaintiff's infected salivary gland on September 9, 2019, prison officials provided the following treatment over the next two months: three different courses of antibiotics (a course of amoxicillin starting September 25; a course of cephalexin starting October 25; and a course of clindamycin starting November 14); a November 2, 2019 referral to an ENT; a November 18, 2019 culture of the infected area; and a November 25, 2019 high priority order for Plaintiff to be seen by an oral surgeon for excision of what they believed to be a stone in Plaintiff's salivary gland when there was no progress on the ENT referral.  The surgery was scheduled for two and a half weeks after the order was put in.  When the surgery was unsuccessful in addressing Plaintiff's pain or the discharge, Plaintiff was referred to, and seen by, an ENT; had a CT scan of the affected area; and prescribed prescription-strength pain medication.

The Court finds that the SAC fails to state an Eighth Amendment violation.  At most, Plaintiff has alleged a difference of opinion between himself and Defendants as to the appropriate medical treatment.  The dismissal of the second amended action is with prejudice because Plaintiff was previously granted leave to amend and has been unable to cure this deficiency.  *Foman v. Davis*, 371 U.S. 178, 182 (1962) (dismissal with prejudice may be appropriate where repeated failure to cure deficiencies by amendments previously allowed).

9

**CONCLUSION**

For the foregoing reasons, the Court DISMISSES this action with prejudice for failure to state a claim.

**IT IS SO ORDERED.**

Dated:  January 4, 2024



JON S. TIGAR
United States District Judge